FRANKLIN D. GRAY

*v.*

FRANCIS AGNEW.

*Filed at Ottawa March 29, 1880.*

1. APPEAL *from an Appellate court—as to a review of questions of fact.* Where the certificate of the Appellate Court, on an appeal to this court, finds no facts in the case, but only states that certain specific evidence was heard in the trial court, and that certain other evidence tending to prove the issues on each side was introduced, this court will not be bound by such certificate, even if the finding be such as is required by the statute to be certified by the Appellate Court, further than as showing the evidence tended to prove the issues.

2. But where the judgment of the trial court, in a suit upon a replevin bond, in which the issues involved the question of the ownership of the property replevied, has been affirmed in the Appellate Court, this court, on an

appeal from the Appellate Court, will regard such judgment of affirmance as a finding of the facts as they were found by the jury, and will not examine the evidence to see whether it sustains the verdict.

3. FACTOR—*power to pledge the property of his principal for his own debt— notice—estoppel.* A power to sell such as is possessed by a factor or broker appointed for the purpose, can only be executed by way of sale, and does not justify a disposition of the property in any other manner. A factor, therefore, has no authority to pledge the goods of his principal as a security for a debt due from himself, even though the creditor has no notice of his character as factor. So if the factor attempts to make such pledge and delivers the goods to the pledgee, the owner may recover them in an action of replevin.

4. Nor would the fact that the consignor invoiced the goods to the person so making the pledge, as purchaser, and not as factor, and that the consignor so directed, for the purpose of concealing the fact that the goods were to be sold on commission from an association of which the consignor was a member and which prohibited the sale of such goods on commission, operate to estop the owner from claiming the goods as against the pledgee, the latter having no knowledge of such facts at the time he received the pledge and his action in respect thereto having in nowise been influenced by their existence.

APPEAL from the Appellate Court for the First District; the Hon. THEO. D. MURPHY, presiding Justice, and the Hon. GEO. W. PLEASANTS and Hon. JOSEPH M. BAILEY, Justices.

This was an action of debt, by Francis Agnew, for the use of Henry B. Horton, against Henry Lawrence & Sons, and Franklin D. Gray, upon a replevin bond, brought in the circuit court of Cook county, and tried before the Hon. JOHN G. ROGERS, Judge, presiding.

The defendants pleaded: 1. *Non est factum.* 2. *Nil debet.* 3. That there had been no trial and judgment on the merits in the action of replevin, and that the goods and chattels at the time when, etc., were the property of Henry Lawrence and others, and not of Henry B. Horton, as supposed, and therefore plaintiff was entitled to recover nominal damages only. 4. That there had been no trial and judgment on the merits of the case, and that the said goods and chattels were at the time when, etc., the property of W. H. Moore, assignee in bankruptcy of E. A. Bigelow & Co., and not of said Horton,

and therefore plaintiff was entitled to recover only nominal damages.  5. That the plaintiff had been only nominally damnified.

The *similiter* was added to the first and second pleas.  As to the third and·fourth pleas the plaintiff replied that the goods and chattels were at the time when, etc., the property of Henry B. Horton, and not of Lawrence & Sons, and of Moore, assignee, etc.; and further, as to said pleas, that the goods and chattels were Horton's, and in his possession, and as to the fifth plea, that the goods and chattels were Horton's, and in his possession, and that he sustained damage to the amount of $4000 by the taking them away.  These replications concluded to the country.

A trial was had, resulting in a verdict and judgment in favor of the plaintiff for $9000 debt and $3,705.56 damages, from which judgment the defendant Gray appealed to the Appellate Court for the First District, in which latter court the judgment of the circuit court was affirmed.

Mr. MELVILLE W. FULLER, for the appellant.

Messrs. GARDNER & SCHUYLER, for the appellee.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

The certificate of [the Appellate Court finds no facts in this case.  It only certifies that certain specific evidence was heard in the court trying the issues, and that certain other evidence, tending to prove the issues on each side, was introduced.  This being true, even if this was such a finding as the statute requires to be certified by that court to this, we could not be bound by it further than to show the evidence tended to prove the issues.  But, inasmuch as the Appellate Court affirmed the judgment of the circuit court, we must regard the judgment of the Appellate Court as having found the facts as they were found by the jury.  We can not, there-

fore, examine the evidence to see whether it sustains the verdict.

We can, therefore, only look to the evidence to see whether it tended to prove the issues, and whether, on that evidence, the court properly instructed the jury, or erred in admitting or rejecting evidence, or in other rulings in the progress of the trial. The Appellate Court held there was no error in the giving or refusing of instructions. The contest grows out of appellee having loaned money to E. A. Bigelow & Co. and renewal notes for prior indebtedness from them to him, and to secure which they pledged to him a quantity of rope, cordage, etc., which was delivered to and received by him. Afterwards, Henry Lawrence & Sons, claiming to be the owners of the goods thus pledged and that they were held by Bigelow & Co. as factors, replevied them, but having obtained possession, they afterwards dismissed the suit, and this action was brought on the replevin bond given when the replevin suit was brought. A recovery was had.

We shall first consider whether the court erred in giving this instruction: "The court instructs the jury that if they believe, from the evidence, that the firm of Henry Lawrence & Sons billed or invoiced the property in question and other property of the same nature to the said firm of E. A. Bigelow & Co. in such a manner as would indicate that the same had been actually sold to said Bigelow & Co. by said Lawrence & Sons, and that said defendants Lawrence, or either of them, directed said Bigelow & Co. to deal with said property so billed or invoiced as their own, and that there was nothing in or about the place of Bigelow & Co. to notify parties dealing with them of their relation to said Lawrence & Sons in regard to said property, which was known to the Lawrences, then as to parties dealing with said Bigelow & Co. in good faith, either by receiving said property, or any part thereof, as security or otherwise, the said defendants Lawrence would be estopped from claiming the title thereto, even though the jury may further believe, from the evidence,

that the property so received was consigned to said Bigelow & Co. under the contract read in evidence in this case, if said Horton had no notice of said contract. And the court instructs the jury, as a matter of law, that where one of two innocent parties must suffer, it must be the one who, by his own act, has enabled his agent or broker to commit a wrong."

This instruction is faulty in several particulars. It states an incorrect rule of law governing factors or commission men. The law governing the rights of consignors and factors long and well established, both in Great Britain and this country, is thus stated by Paley on Agency (Dunlap's ed.), p. 213: "A power to sell, such as is possessed by a factor or broker appointed for the purpose, can only be executed by way of sale, and does not justify a disposition in any other manner. A factor, therefore, can not dispose of the goods in the way of barter, and it is clearly settled that he has no authority to *pledge* the property entrusted to him. Nor is it of any consequence that the pledgee is ignorant of the factor not being the owner." In support of the propositions numerous cases are referred to in the notes.

In Story on Bailments, sec. 326, it is said that "In America the general doctrine, that a factor can not pledge the goods of his principal, has been frequently recognized."

And Kent, in his Com., vol. 2, p. 625–28, says, "Decisions in this country have fully settled the doctrine that a pledge by a factor of his principal's goods is wholly tortious and the owner may recover their whole value of the pledgee without any reduction or recoupment for his claim against the factor." Numerous cases are referred to which support the rule.

Story, in his work on Agency, sec. 113, states the rule thus: "On the other hand, factors have no incidental authority to barter the goods of their principals, or to pledge such goods for advances made to them on their own account or for debts due by themselves."

See Wharton on Agency, sec. 748, to the same effect as

Paley has stated the rule. The English reports abound in
adjudged cases announcing the same rule, and American cases
are abundant.

The rule is clearly stated by Chancellor Kent in the case of
*Rodriguez* v. *Hefferman,* 5 J. Ch. R. 429, where it is said : "A
factor may sell out and out in the way of business, and the
sale will be binding, but he can not pledge even under the
formality of a bill of parcels; and this was clearly such an
act. It was an assignment to secure a debt, with a trust to
account for the surplus. It was, therefore, a mortgage and
not an absolute sale. It is a well settled and understood
rule, that the factor can not pledge even though the creditor
has no notice of his character as factor. In such a case every
creditor trusts and deals at his peril."

Kent lays down the same rule in his Commentaries, vol. 2,
p. 625. On p. 627 he says: "To guard against abuse and
fraud, it is admitted that if the factor be exhibited to the
world as owner, with the assent of the principal, and by that
means obtains credit, the principal will be liable." It does
not appear that Bigelow thus obtained credit, but did so on
his own representations and false statements, and appellee so
testified. He made no further inquiry, nor did he call for
bills or instructions. See *Graham* v. *Dyster,* 2 Stark. 21.

In fact there can be no question of the rule. It is true that
in England and some of the States of the Union the rule has
been changed by legislation, but that only shows that the rule
was too firmly fixed to be abrogated by decisions of the courts.

Under these authorities, then, it was wrong to refer in the
instruction to the fact that if nothing appeared in or about the
house of E. A. Bigelow & Co. to indicate the relations of
Lawrence & Sons and Bigelow & Co., as an important fact, as
the authorities hold in case of a pledge, the want of notice is
immaterial for the protection of the rights of the owners.
Notice has nothing to do with the protection of appellee's
rights.

Nor does the case of *Michigan Central Railroad Co.* v. *Phillips*, 60 Ill. 190, modify the rule. In that case the question of consignor and factor was not involved, but the controversy was, whether there had been a sufficient delivery by a vendor to a vendee to waive a precedent condition of payment on delivery, and the question, whether an innocent purchaser from the vendee was protected. It was held in that case, as it had been held in a number of previous cases, that the vendor having clothed his vendee with the *indicia* of ownership by delivery of possession, he could not claim the property as against an innocent purchaser from his vendee. The question involved in the case at bar was not presented or discussed in that case, and it can not control this.

Again, the concluding sentence of the instruction, although it may be correct law, was well calculated to mislead the jury. From it they would understand that by simply placing the property in the hands of Bigelow & Co., Lawrence & Sons had enabled the former to perpetrate the fraud, and they should, therefore, sustain the loss; but we have seen that, of itself, clearly does not estop Lawrence & Sons, and cast the loss on them. It should have been qualified by informing them that their consigning the goods to them for sale on commission would not have such an effect.

But the question is presented by this instruction, whether the facts that the goods were invoiced to E. A. Bigelow & Co. as purchasers, and not as factors, and that Lawrence & Sons directed them, for the purpose of concealing the fact that the goods were to be sold on commission from the manufacturing association, and of which facts appellee had no notice, render the consignors liable to suffer the loss. If Lawrence & Sons had told appellee that Bigelow & Co. were the owners, or had they so informed others from whom appellee had learned the fact, or that fact had come to his knowledge from other sources, then there could have been no doubt that Lawrence & Sons would have been estopped to claim the property. Such conduct would have induced appellee to act differently

from what he would had he known the truth. But it is not shown that appellee, when he received the goods in pledge, knew of the facts. Appellee testified that he did not know from whence the cordage came to Bigelow & Co.; nor did he claim, when on the stand, that he had seen the bills from Lawrence & Sons to Bigelow & Co., before he received the pledge, but had seen similar bills. Hence, he can not claim that Lawrence & Sons did any act by which he was misled.

In the case of *Patterson* v. *Tash*, 2 Strange, 1178, the Court of King's Bench held, " that though the factor has power to sell, and thereby bind the principal, yet he can not bind or affect the property of the goods by pledging them as a security for his own debt, though there is the formality of a bill of parcels and a receipt." We have found no case that modifies the rule there announced.

The instruction was, therefore, erroneous in thus limiting the rule by referring the question of the bills being made in the name of Bigelow & Co. as purchasers, and the want of anything about the house to indicate that the firm was selling goods on commission.

From what has been said, it follows that the circuit court erred in refusing defendant's first instruction; and the question, whether appellee relied on what Bigelow told him as to his ownership, and induced him to purchase, was improper, and the court erred in permitting it to be answered. Under the authorities referred to, it did not matter what Bigelow said, as he could pledge no greater title than he held in his own right.

For the errors indicated the judgment of the Appellate Court must be reversed.

*Judgment reversed.*

Mr. JUSTICE DICKEY, dissenting:

I can not concur in the views of the majority of this court as expressed in its opinion delivered by the Chief Justice.

I think there was no error in the instruction in question.

It is true, Paley said: "A power to sell, such as is possessed by a factor appointed for the purpose, can only be exercised by way of sale, and does not *justify* a disposition in any other manner. A factor, therefore, can not dispose of goods in the way of barter, and it is clearly settled that he has *no authority* to *pledge* the property entrusted to him. Nor is it of any consequence that the *pledgee* is ignorant of the factor's *not* being the owner." But in note (e) to this paragraph it is added, as a qualification, or, rather, limitation, of these words, (though not inconsistent with them,) that, "if, however, the owner arms the factor with such *indicia* of property as *to enable* him to deal with it as his own, and mislead others, the factor in that case *can bind* the *property* by pledging it."

It is true, too, as stated by Story on Bailments, that "the *general doctrine* that a factor can not pledge the goods of his principal has been frequently recognized;" but this instruction in nowise invades this *general* doctrine. Of course the factor who pledges goods he has for the purpose of *sale* only, violates his duty, and he can not lawfully do so.

It is also true that Kent has, in secs. 625–628, inclusive, laid down the same doctrine quoted from Paley, that a factor can not pledge goods in his hands for sale alone, and that to pledge goods is "beyond the scope of the factor's power," and "is tortious," but, he adds, "if the factor be exhibited to the world as the owner, with *the assent of his principal*, and *by that means* obtains credit, the principal will be liable."

But it is said in this case "it does not appear that Bigelow *thus* obtained credit, but did so on *his own representations* and *false statements*." This, I think, is a misapprehension of the case at bar.

The verdict in this case is in Horton's favor. The facts, then, are to be taken as in accord with the evidence tending to support the verdict. Where evidence is found in support of the verdict, which is uncontradicted, we must treat it as absolutely true, and where the evidence is contradictory, we

must assume that the jury found the weight of evidence to be in plaintiff's favor.

Examining the record by these rules, I think it does appear that Bigelow did obtain credit as the owner of these goods by reason of the fact that the factor was exhibited to the world as the owner *with the assent of the principal.*

The case under the verdict as I understand it is this: Prior to July, 1875, E. A. Bigelow & Co. were a firm doing business in Chicago as dealers on their own account. They dealt in oils, cordage, rope, etc., for several months before the 19th of July, 1875, and bought their rope and cordage of Lawrence & Sons, of New York, and of others. Up to that day they did not do anything in the nature of a commission or brokerage business.

On that day they made a special and secret contract with Lawrence & Sons to get their cordage and rope from them, in which it was agreed that Lawrence & Sons should manufacture and ship to Bigelow & Co. cordage, the prices to be governed by the list rate of the New York Cordage Manufacturing Association, and would allow them a discount of $1\frac{1}{2}$ cents per pound from that list price, and that Bigelow & Co. would sell the same and report sales each month, and on receipt of sales Lawrence & Sons might draw at thirty and sixty days for the balance due them from such sales; that the goods so shipped shall be on consignment and *not sold* to Bigelow & Co., but should be the property of Lawrence & Sons, and held by Bigelow "as commission stock," and subject to the order of Lawrence & Sons at any time; that they should be allowed at all times to examine the account of sales of Bigelow & Co., also their stock in store to see where their money and stock are; and it is declared Bigelow & Co. are acting as agents of Lawrence & Sons, and shall give full account to them or any information, thereby giving them "full control of their own property;" that account of sales shall state actual prices sold at, and the difference between actual sales and the price of hemp in fifty bale lots, and the

balance between that and the prices sold shall be retained by Bigelow & Co. as their commissions,—Bigelow & Co. to guaranty all sales made and pay over in thirty and sixty days from date of sales "the amount of the purchase price of such sales," whether "the amount of such purchase price be received by them or not."

This arrangement was known to be in violation of the rules of the cordage association with which the Lawrences were connected, and for that reason it was desired to be kept as a secret from them.

Accordingly, goods were shipped from time to time under this contract, and when shipped were charged on the books of Lawrence & Sons as so much sold to Bigelow & Co., and were invoiced by Bigelow & Co. as sold to them; and when received by Bigelow & Co. they were credited on their books as goods purchased from Lawrence & Sons (at the price fixed in the contract), and no change was made at the Chicago store in the sign, or mode of keeping books, or in any other way to indicate a commission business. This was known to the Lawrences. It is true, monthly accounts of sales made by Bigelow & Co. were made to Lawrence & Sons, stating the rates of their sales to customers, and price at which the goods were invoiced to them, and deducting the $1\frac{1}{2}$ cents per pound "as commissions." So the business progressed. The book-keeper of Bigelow says this was not in fact a commission business, and Horton, who was about the store of Bigelow & Co. a great deal, never saw a sign or indication or heard an intimation that Bigelow & Co. were other than mere purchasers and owners of all these goods, nor does it appear that any persons other than the parties to the contract had the slightest intimation of a commission business.

In September, 1875, one of the Lawrences being in Chicago had several talks with Bigelow, and gave him to understand that their special contract and profit should be kept a secret from the trade. But some of the manufacturers in the east

got an inkling that there was some private and special arrangement between these parties, and appointed a committee to investigate charges, which had been made, that Lawrence & Sons had goods at Chicago on consignment. On October 20, 1875, Lawrence & Sons wrote to Bigelow & Co., of Chicago, requesting them to "deny the same," giving the names of the committee, and saying: "They will want to see your stock likely, but don't show it unless you have a little pile by itself; * * * they say the rope is consigned. *We tell them the rope is bought* and paid for *same as others.* Let us hear from you," etc. And again, on the 26th of October, 1875, George Lawrence writes to Bigelow a familiar letter, saying: "Our committee leave for Chicago to-night. * * They will ask many questions, among which will be, How do the Lawrences sell you? Do you buy hemp and have it worked, or do they consign it to you? You, of course, get your hemp and have it worked, as all other large dealers do, and expect to so long as you do anything in it. * * * You must not pump worth a cent."

In January, 1876, while this business is going on in the same way, Bigelow, being indebted to Horton for unpaid money borrowed, procures from Horton a binding contract to extend the time of payment for a definite time, and a loan of an additional amount, and to secure the entire sum placed in his hands the rope and cordage in dispute as collateral security. Horton took possession, and in February Bigelow & Co. failed, owing Lawrence & Sons a large amount. Thereupon Lawrence & Sons took these goods from Horton by replevin.

Before the time when Horton received these goods, and before the negotiation with Bigelow, he was told by Bigelow that he had an arrangement with the Lawrences by which his hemp was bought by the ton, and he paid for it and so much for the manufacture. He had before that time seen the invoices, and they said Bigelow & Co. "bought of Lawrence & Sons" such goods, etc.; and he made the loan on the faith of the ownership of the goods by Bigelow & Co., and with-

out any intimation that they were in any sense factors, or that Lawrence & Sons were the owners of the goods.

Now, when Bigelow told Horton that he bought his hemp by the ton and paid for the manufacture of it, and accomplished this through Lawrence & Sons, it was not merely "his own representations and false statements," but was the representation and false statements which Lawrence & Sons put in his mouth, by the letters of October, 1875, wherein they said:  "You, *of course,* get your hemp and have it worked, as all other large dealers do."

It is true that was said in view of an interview with the committee, but it is asking too much of Bigelow not only to lie for them to the committee, but to tell a different story to other people, which would surely expose his falsehood. When a man sets in motion vicious instrumentalities, he can not claim immunity from any of the natural consequences of his act. Bigelow being told to tell that false story to the committee, most naturally, to give face to the story, was to be expected to say the same thing to every one to whom he should speak on the subject.

Hence, this is such a case as that spoken of in the note in Paley, where it is said: "If, however, the owner arms the factor with such *indicia* of property as to *enable* him to deal with it as his own and mislead others, the factor in that case can bind the property by pledging it."

In fact, this is not the ordinary case of a factor to which the rules in favor of the owner so rigidly apply.

A factor proper is one who sells for the profit of his principal, having really no interest in the transaction except his commissions. In this case, the supposed factor is the only one having any interest in the amount for which the property was to be sold. The position of the Lawrences, as to this property, was not in substance that of owners. The substance of the contract is a sale of the property to Bigelow & Co. at a fixed price, for them to sell again for whatever profit they could get, for their own use, with an arrangement that

the title should rest in Lawrence & Sons, for their own security, until a sale should be effected; and a further provision, that if successful sale could not be made, Bigelow & Co. might return the property in payment of their liability. The rules of law, as to factors proper, rest upon the necessities of commerce. No such necessity demands special protection to such a contract as this.

As applicable to the proofs and the facts deducible therefrom in this case, as above stated, I see no error in the instruction held by my brethren to be vicious.